COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

                                                
NO. 2-05-357-CR

 

 

JOHN ANSON WHITE                                                                       
APPELLANT

 

                                                            
V.

 

THE STATE OF TEXAS                                                                            
STATE

 

                                                      
------------

 

           
FROM COUNTY CRIMINAL COURT NO. 1 OF DENTON COUNTY

 

                                                      
------------

 

                                                     
OPINION

 

                                                      
------------

Appellant
John White appeals his conviction for assaultCfamily
violence.  A jury found Appellant guilty, and the trial court assessed his
punishment at 240 days= confinement, suspended
for a period of eighteen months, and a $500 fine. In four points, Appellant contends
that the trial court erred in denying his motion to suppress, by allowing the
State to comment on his failure to testify, by allowing the State to employ a Astraw
man@
theory, and by failing to include the requested instructions in the jury charge. 
We affirm.

 

FACTUAL
BACKGROUND

On
January 5, 2005, Donna White, Appellant=s
wife, called 911, but she hung the phone up before providing the dispatcher
with any information.  Within ten to fifteen minutes, Officer Matthew
David Harmuth responded to the address from which the
call originated to investigate the source of the phone call.  When Officer
Harmuth arrived at the house, he approached the front
door and a woman, later identified as Donna White, answered the door dressed
only in underwear.  According to Officer Harmuth,
she appeared visibly shaken and terrified and stated that she was Ascared.@ 
Officer Harmuth noted that she had an injury to her
eye.  He asked her if anyone else was inside the house, and she informed
him that her husband was also there.

 

Based
on his observations, Officer Harmuth informed the
woman that he needed to come inside the house, at which point she stepped aside
and opened the door.  Officer Harmuth followed
her through the house and into the bedroom where he found Appellant
lying in bed.  Officer Harmuth asked Appellant
what had happened, and Appellant responded that he and his wife had
fought.  Officer Harmuth testified that
Appellant informed him that he was trying to sleep, his wife was making a lot
of noise, and he became mad, but he did not physically hurt her.  Officer Harmuth observed a cordless phone broken on the floor, and
he asked Appellant what had happened to the phone.  Appellant informed him
that he had grabbed the phone from Donna and thrown it because he believed that
Donna was trying to call their daughter and he did not want to bother her with
their arguing.  While Appellant was relaying this story to Officer Harmuth, Donna entered the bedroom and yelled that it was
not true.

Officer
Wells, a back up officer, arrived at the scene. 
Officer Wells spoke with Appellant in the kitchen while Officer Harmuth continued to question Donna.  In the light, a
bruise and knot above Donna=s 
left eye became more visible to Officer Harmuth,
and Officer Harmuth observed red marks around her
neck.  In response to Officer Harmuth=s
questioning, Donna stated that she was in the bathroom when Appellant became
upset with her because she was making noise while he was trying to sleep. 
Donna informed Officer Harmuth that Appellant had
told her that he hated her, hit her with a closed fist above her left eye,
grabbed her around the neck, and threw her to the floor.  At that point,
Donna attempted to dial 911, but Appellant grabbed the phone and threw it,
causing it to break.  The officers determined that an assault had
occurred, it was family violence, and there was still a threat of violence, so
the officers placed Appellant under arrest.

Donna
refused to give the officers a statement.  At trial, Donna testified that
on the day in question, she and Appellant were driving down the interstate when
Appellant hurt her feelings, so she began Abeating
on his arm.@ 
She testified that, in order to avoid having an accident, his arm Aglazed@
her temple.  At that point, they turned the car around and went home,
where Appellant began making bacon and eggs.  Donna testified that she
wanted to continue to fight, so she started hitting him and grabbing him around
the throat.  She testified that she got the red marks on her throat because
Appellant had pulled her sweatshirt back.  She also testified that she
called 911 because she was very hurt and angry, but she thought better about it
and hung up immediately.  She also testified that she is terrified of
police officers.  According to Donna, Officer Harmuth
continuously asked to be allowed into the house.  She told him no, yet he
demanded entry, and he entered the house on his own.

SUPPRESSION
OF EVIDENCE

In his first point, Appellant contends that the trial
court erred in denying his motion to suppress and in failing to suppress the
evidence obtained as a result of Officer Harmuth=s
warrantless entry into his house.

1.
Standard of Review

We review a trial court=s
ruling on a motion to suppress evidence under a bifurcated standard of review. 
Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d
85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court=s
decision, we do not engage in our own factual review.  Romero
v. State, 800 S.W.2d 539, 543 (Tex. Crim. App.
1990); Best v. State, 118 S.W.3d 857, 861
(Tex. App.CFort
Worth 2003, no pet.).  The trial judge is the sole trier of fact
and judge of the credibility of the witnesses and the weight to be given their
testimony.  State v. Ross, 32 S.W.3d
853, 855 (Tex. Crim. App. 2000); State v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999). 
Therefore, we give almost total deference to the trial
court=s
rulings on (1) questions of historical fact and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.  Johnson
v. State, 68 S.W.3d 644, 652‑53 (Tex. Crim.
App. 2002); State v. Ballman, 157 S.W.3d 65, 68 (Tex. App.CFort Worth 2004,
pet. ref=d). 
But when the trial court=s rulings do not turn on
the credibility and demeanor of the witnesses, we review de novo a trial court=s
rulings on mixed questions of law and fact.  Estrada
v. State, 154 S.W.3d 604, 607 (Tex. Crim. App.
2005); Johnson, 68 S.W.3d at 652‑53.

When
reviewing a trial court=s ruling on a mixed
question of law and fact, the court of appeals may review de novo the trial
court=s
application of the law of search and seizure to the facts of the case.  Estrada,
154 S.W.3d at 607. 
When there are no explicit findings of historical fact, the evidence must be
viewed in the light most favorable to the trial court=s
ruling.  Id.

We
must uphold the trial court=s ruling if it is
supported by the record and correct under any theory of law applicable to the
case even if the trial court gave the wrong reason for its ruling.  Armendariz v. State, 123 S.W.3d
401, 404 (Tex. Crim. App. 2003), cert. denied, 541 U.S. 974 (2004); Ross,
32 S.W.3d at 856; Romero, 800 S.W.2d at 543.  

In determining whether a trial court=s
decision is supported by the record, we generally only consider evidence
adduced at the suppression hearing only because the ruling was based on it
rather than on evidence introduced later.  Rachal
v. State, 917 S.W.2d 799, 809 (Tex. Crim. App.), cert.
denied, 519 U.S. 1043 (1996).  However, this general rule is
inapplicable where, as in this case, the suppression issue has been
consensually relitigated by the parties during the
trial on the merits.  Id.  Where the State raises the issue at
trial either without objection or with subsequent participation in the inquiry
by the defense, the defendant has made an election to re‑open the
evidence, and consideration of the relevant trial testimony is appropriate in
our review.  Id.

2. 
Applicable Law

The State asserts that the warrantless entry into
Appellant=s house was justified on the basis of
exigent circumstances.  The Fourth Amendment protects against unreasonable
searches and seizures.  U.S. Const.
amend.  IV.  To
suppress evidence because of an alleged Fourth Amendment violation, the
defendant bears the initial burden of producing evidence that rebuts the
presumption of proper police conduct.  Ford v. State, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).  A defendant
satisfies this burden by establishing that a search or seizure occurred without
a warrant.  Id.  Once the defendant has made
this showing, the burden of proof shifts to the State, which is then required
to establish that the search or seizure was conducted pursuant to a warrant or
was reasonable.  Id.

Whether
a search is reasonable is a question of law that we review de novo.  Kothe
v. State, 152 S.W.3d 54, 62 (Tex. Crim. App.
2004).  Reasonableness is measured by examining the totality of the
circumstances.  Id. at 63.  It
requires a balancing of the public interest and the individual=s
right to be free from arbitrary detentions and intrusions.  Id. 
A search conducted without a warrant is per se unreasonable unless it falls
within one of the Aspecifically
defined and well-established@ exceptions to the warrant
requirement.  McGee v. State, 105 S.W.3d
609, 615 (Tex. Crim. App.), cert. denied, 540 U.S. 1004 (2003); see
Best, 118 S.W.3d at 862. 

The
emergency doctrine has been formulated to allow warrantless searches that would
otherwise be illegal where there is reasonable cause to believe that, absent an
immediate search, serious bodily harm or death may result.  Brimage v. State, 918 S.W.2d
466, 500-01 (Tex. Crim. App. 1994), cert. denied, 519 U.S. 838 (1996); see
also Georgia v. Randolph, 126 S. Ct. 1515, 1525 (March 22, 2006)
(noting that Ano
question has been raised . . . about the authority of the police to enter a
dwelling to protect a resident from domestic violence; so long as they have
good reason to believe such a threat exists, it would be silly to suggest that
the police would commit a tort by entering . . . to determine whether violence
(or threat of violence) has just occurred or is about to (or soon will) occur.@) 
The emergency doctrine does not necessarily allow police officers to make
warrantless entries and searches every time there is a need to protect or
preserve life or prevent serious injury.  Laney v.
State, 117 S.W.3d 854, 863 (Tex. Crim. App.
2003).  Rather, courts should carefully apply the objective
standard of reasonableness when determining whether an officer=s
warrantless entry and search is justified under the emergency doctrine.  Id. 
This objective standard looks at the police officer=s
conduct and Atakes
into account the facts and circumstances known to the police at the time of the
search.@ 
Colburn v. State, 966 S.W.2d 511, 519 (Tex.
Crim. App. 1998); Brimage, 918 S.W.2d at 501; Janicek v.
State, 634 S.W.2d 687, 691 (Tex. Crim. App.
1982).

The
motivation for an entry pursuant to the emergency doctrine must be Atotally
divorced from the detection, investigation, or acquisition of evidence relating
to the violation of a criminal statute.@ 
Laney, 117 S.W. 3d at 860;  Brimage, 918 S.W.2d at 501
n.5; Gonzalez v. State, 148 S.W.3d 702, 707 (Tex. App.CAustin 2004, pet.
ref=d); 
see also Corbin v. State, 85 S.W.3d 272, 281 n.7 (Tex. Crim. App. 2002) (Cochran, J., concurring)
(emergency search must not be primarily motivated by intent to arrest and seize
evidence, and it is essential that courts be alert to possibility of
subterfuge).  The scope of the search must also be strictly circumscribed
by the emergency which justified its initiation.  Mincey v. Arizona,
437 U.S. 385, 390, 98 S. Ct. 2408, 2412 (1978); Laney, 117 S.W.3d at 862.

Consent to search is another of the well‑established
exceptions to the constitutional requirements of both a warrant and probable
cause.  Carmouche, 10 S.W.3d at 331.  In order to be valid, the
consent must Anot
be coerced, by explicit or implicit means, by implied threat or covert force.@ 
Id.; see also Allridge v. State, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991).  (stating that, AThe
consent must be shown to be positive and unequivocal, and there must not be any
duress or coercion.@).  By the same
token, consent is not established by Ashowing
no more than acquiescence to a claim of lawful authority.@  Carmouche, 10 S.W.3d at
331 (quoting Bumper v. North Carolina, 391 U.S. 543, 549, 88 S. Ct.
1788, 1792 (1968)).

3.
Evidence Presented

There is no dispute that the initial search in this
case was conducted without a warrant.  Officer Harmuth
was the only person to testify during the suppression hearing.  The
evidence presented at the suppression hearing shows that Officer Harmuth responded to a 911 call where the caller hung up
before giving any information to police.  He arrived at the scene
approximately ten to fifteen minutes following the 911 hang-up call and did not turn on his lights or siren when responding
to the scene.  When he arrived, he looked through the window and saw a
light was on in the house, that the house was ransacked, and that two small
dogs were standing by the door.  Donna answered the door approximately a
minute or two later, dressed only in her underwear.  She cracked the door,
and Officer Harmuth could not see what was behind the
door.  Officer Harmuth asked her if she was
okay, and she said, ANo.@ 
He asked her what was going on, and she stated that she was Ascared.@
 He testified that Donna appeared to be visibly shaken and that he saw a
large welt above her left eye and some marks around her throat and neck. 
Officer Harmuth asked Donna whether anyone else was
in the house, and she responded that her husband was there.  He asked her
where her husband was, and she told him that her husband was in the
bedroom.  He told her that he was going to come inside to make sure
everything was fine.

Officer
Harmuth stated in the suppression hearing that he did
not obtain Donna=s consent to enter the
house; rather he told her that he was coming in.  He stated that he Afelt
like there was an emergency going on inside@
because Donna Awas
visibly shaken, and had injuries@
and because the 911 hang-up call had come from that residence. 

Officer
Harmuth acknowledged on cross examination that he
never attempted to determine why Donna told him that she was Ascared.@ 
He further testified that his purpose in entering the house was Ato
investigate what was going on.@  He stated that he
was acting under an exigency because of Donna=s
injuries and the 911 hang-up call.  On cross examination, Officer Harmuth further explained that 911 hang-up calls are not
unusual at all, and the source of this particular 911 hang-up could not be
explained.

Following
the suppression hearing, the trial court ruled that exigent circumstances
existed to justify the search to render aid or assistance to the person who the
officer believed was in need of assistance.  The trial court found that
there was a 911 call hang-up, fifteen minutes later the officer arrived, and he
found the room ransaked.  The court found that
the woman was trembling and scared, and she had a large welt over her eye and
marks around her neck.  Furthermore, the trial court found that when the
officer asked if someone was inside, she said, AYes,
but I am scared,@
and the officer thought she may have been assaulted.  The trial court also
stated in the record that Donna impliedly consented to Officer Harmuth=s entrance into the house
by opening the door and stepping aside. 

At
trial, Officer Harmuth testified that he did not
respond to the 911 hang-up call with his full lights and sirens on because the
caller had hung up the phone, so the dispatcher did not have any additional
information to give him.  When he arrived at the house, a light was on inside,
shredded papers were on the floor, and it was quiet.  He knocked on the
door, waited, rang the doorbell, and knocked again.  Through the window,
he saw a woman approach the door wearing only underwear.  She partially
opened the door and Officer Harmuth asked her if
everything was okay.  According to Officer Harmuth,
she appeared visibly shaken, scared and terrified.  Officer Harmuth asked her if everything was okay, and she informed
him that she was Ascared.@ 
He noticed that she had an injury to her eye.  Officer Harmuth
asked whether there was anyone in the house with her, and she responded that
there was and that she was scared.  He asked her who was in the house with
her and she informed him that her husband was inside the house with her and he
was in the bedroom. 

At
that point, Officer Harmuth requested that a backup
unit respond to the location.  Officer Harmuth
told Donna that he needed to come inside, at which point she stepped aside and
opened the door.  At trial, he stated that, based on his observations of
Donna at the door, he Abelieved
there was something more than just a 911 hang-up going on.  There was
obviously a situation which needed to be investigated, and [he] went inside.@ 
Because he was unsure of whether Appellant was still in the bedroom, he scanned
the rooms as he  walked through the house and into the bedroom where he
found Appellant lying in bed.  At that point, Officer Harmuth
began to ask Appellant what had happened, and Appellant informed him that he
was trying to get some sleep, but his wife was making noise, and he got mad,
but he did not physically hurt her.  Donna entered the bedroom and yelled,
AThat=s
not true.@ 
Officer Harmuth noticed a cordless phone on the floor
that appeared to be broken.  Appellant told Officer Harmuth
that the phone was broken because he thought Donna was going to call their
pregnant daughter to discuss their fight, and he did not want Donna to upset
her.

Once
the back-up officer, Officer Wells, arrived, he and Officer Harmuth
questioned Appellant and Donna separately.  Officer Harmuth testified that as he questioned Donna, she appeared
to be visibly shaken, scared, and terrified.  She told Officer Harmuth that Appellant had assaulted her because he was
trying to sleep and she was making noise.  She informed Officer Harmuth that Appellant had hit her with a closed fist above
her left eye, grabbed her by the throat, and threw her to the floor.  She
then attempted to dial 911 on the phone, but Appellant grabbed the phone and
threw it.  Officer Harmuth and Officer Wells
determined that an assaultCfamily
violence had occurred and there was still a threat of family violence, and they
placed Appellant under arrest. 

We
need not address whether Donna consented to Officer Harmuth=s
entry into the house because the entry was justified under the emergency
doctrine.  At the time of the search, Officer Harmuth
was aware that he was responding to a 911 hang-up call, the house was
ransacked, a visibly shaken and scared woman answered the door clad only in her
underwear and stated that she was Ascared,@
her husband was inside the house with her, and she had an injury above her left
eye.  Thus, according to the facts and circumstances known to Officer Harmuth at the time of the entrance into the house, we hold
that he had an objectively reasonable cause to believe that, absent an
immediate search, serious bodily harm or death may result.  See Laney,
117 S.W.3d at 863; Brimage,
918 S.W.2d at 500-01; see also Randolf, 126 S. Ct. at 1525 (stating that police may
be justified in entering a dwelling to protect the resident from domestic
violence, so long as they have good reason to believe that such a threat exists
or to determine whether violence has just occurred).  Additionally, Officer
Harmuth=s
search was totally divorced from the investigation relating to a violation of a
criminal statute because his purpose for entering the house was to determine
whether Donna was in danger.  See Laney, 117 S.W.3d at 862.  Finally, the scope of the search
was strictly circumscribed by the emergency which justified its initiation
because Officer Harmuth=s
entrance into the house was limited to the determination of whether Donna was
in danger of serious bodily harm or death.  See id.

The
dissent in the instant case opines that a recent United States Supreme Court
case requires the conclusion that the emergency doctrine is not applicable to
the facts of this case because Officer Harmuth=s
warrantless entry into the house was to investigate a possible completed
criminal offense.  Dissent at 6.  See Hammon v. Indiana, 126 S. Ct. 2266 (2006).  In
that case, and its companion case, Davis v. Washington, 126 S. Ct. 2266
(2006), the Court dealt with the issue of whether statements were testimonial when
they were procurred by law enforcement personnel
during a 911 call or at a crime scene, and thus, subject to the requirements of
the Sixth Amendment=s Confrontation
Clause.  Id. at 2270.  That is not
the issue before us.  Therefore, we disagree with the dissent in the case
at bar that our holding violates the holding of Hammon
or Davis.  We overrule Appellant=s
first point.

COMMENT
ON THE FAILURE TO TESTIFY

In
his second point, Appellant contends that the trial court erred by allowing the
State to comment on his failure to testify.  During the State=s
closing argument, the following exchange occurred:

[STATE]:
You look at self-defense.  His defense isCself-defense is you
have to find, and they have to admit, that they did have a contact. 
Okay.  He=s got to say he hit her. 

[DEFENSE COUNSEL]:
That=s a directB
thatBYour
Honor, I=m sorry.  I
object. That is a misstatement of the law.  I object to that.  That=s a comment on
failure to testify.  That=s a B

 

[STATE]: Your
Honor, would you rule on the objection?

 

THE COURT: Make
your objection, please.  Don=t testify.

 

[DEFENSE COUNSEL]:
I object that it=s Fifth Amendment
grounds; Article I, Section 10.  He=s made a direct comment on failure to
testify, and I object.

 

THE COURT:
Okay.  I believe what he said was, she=s got to say he hit him [sic].  That=s what the record
states in front of me that I=ve got.

 

[DEFENSE COUNSEL]:
I heard B

 

THE COURT: And I=ll overrule the
objection.

 

[DEFENSE COUNSEL]: Bthat he=s got to admit
it.  That=s what I heard.

 

THE
COURT: That=s what the court reporter has written
right here, she=s got to.

Under
code of criminal procedure article 38.08, a defendant=s
choice to not testify on his own behalf shall not be taken as circumstance against
him, and his failure to so testify shall not be alluded to or commented on by
counsel.  Tex. Code
Crim. Proc. Ann. art. 38.08 (Vernon 2005).  To determine if a prosecutor=s
comment violated article 38.08 and constituted an impermissible reference to an
accused=s
failure to testify, we must consider whether the language used was manifestly
intended or was of such a character that the jury would have naturally and
necessarily considered it to be a comment on the defendant=s
failure to testify.  Tex. Code Crim. Proc. Ann. art.
38.08; see Bustamante v. State, 48 S.W.3d 761,
765 (Tex. Crim. App. 2001); Fuentes v. State, 991 S.W.2d
267, 275 (Tex. Crim. App.), cert. denied, 528 U.S. 1026 (1999). 
The offending language must be viewed from the jury=s
standpoint, and the implication that the comment referred to the accused=s
failure to testify must be clear.  Bustamante, 48 S.W.3d at 765; Swallow v. State, 829 S.W.2d 223, 225 (Tex. Crim. App. 1992).  A mere
indirect or implied allusion to the defendant=s
failure to testify does not violate the accused=s
right to remain silent.  Wead v. State,
129 S.W.3d 126, 130 (Tex. Crim. App. 2004); Patrick
v. State, 906 S.W.2d 481, 490-91 (Tex. Crim. App.
1995), cert. denied, 517 U.S. 1106 (1996).

Prior to the statement to which Appellant objected, the
prosecutor discussed Donna=s testimony and the
affidavit that Donna wrote, saying ANowhere
in there does she ever say that [Appellant] didn=t
hit her, not one time.@ 
The prosecutor then began discussing self-defense.  The record reflects
that the prosecutor said, AHe=s
got to say he hit her.@  However, following
Appellant=s objection, the trial court said, in
front of the jury, that he heard the prosecutor say, AShe=s
got to say . . . .@  Then, the trial
court stated that the record in front of him said, AShe=s
got to say.@  Appellant contends that the
prosecutor=s comment undoubtedly pointed to a
lack of evidence that could only have come from Appellant, and therefore, it
was improper.  However, the evidence regarding whether Appellant struck
Donna could also have been presented by Donna, as well as Appellant. 
Additionally, it is not precisely clear that the prosecutor was in fact
alluding to Appellant when he made the statement; the above-quoted discussion
likely caused confusion or doubt in the mind of the jury as to whether the
prosecutor had said Ahe@
or Ashe.@  
Viewing the statement that Appellant contests from the jury=s
standpoint, we hold that there is no clear implication that the comment
referred to Appellant=s failure to
testify.  See Bustamante, 48 S.W.3d
at 765.  The language the prosecutor used was not of such a
character that the jury would have naturally and necessarily have considered it
to be a comment on the Appellant=s failure
to testify.  See id.  Accordingly, we overrule Appellant=s
second point.

ASTRAW
MAN@ THEORY

In his third point, Appellant alleges that the State
engaged in improper Agamemanship@
by first calling Officer Harmuth to testify as to
hearsay statements from the complainant, Donna, and by calling Donna for the
sole purpose of impeaching her with prior statements that would otherwise be
inadmissible.  He asserts that the State knew that Donna was going to
testify adversely to the State=s case, and to counter the
adverse testimony, the State called Officer Harmuth
to get prior statements made by Donna presented to the jury before she
testified, knowing that her statements would be inconsistent with Officer Harmuth=s testimony regarding her
prior statements.

We
review a trial court=s ruling to admit or
exclude evidence under an abuse of discretion standard.  Green v. State,
934 S.W.2d 92, 101‑02 (Tex. Crim. App.1996); Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh=g).   If the court=s
decision falls outside the Azone
of reasonable disagreement,@
it has abused its discretion.  ­­Montgomery, 810 S.W.2d at 391.  As long as the trial court=s
ruling falls within the zone of reasonable disagreement, we will affirm its
decision.  Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).  The
trial court=s decision must be reasonable in view
of all the relevant facts.  Santellan v. State, 939 S.W.2d 155, 169
(Tex. Crim. App. 1997). 

Texas
Rule of Evidence 607 provides that the credibility of any witness may be
attacked by any party, including the party that called the witness.  Tex. R. Evid.
607.  The right to impeach one=s
own witness does not, however, permit a party to call a witness primarily for
the purpose of impeaching the witness with otherwise inadmissible hearsay
testimony.  Zule v. State, 802 S.W.2d 28, 34 (Tex.
App.CCorpus
Christi 1990, pet. ref=d);
Pruitt v. State, 770 S.W.2d 909, 909 (Tex. App.CFort
Worth 1989, pet. ref=d).


The
State argues that the hearsay testimony of which Appellant complains was
admissible because the statements fall within the excited utterance exception
to the prohibition against hearsay.  See Tex. R. Evid. 803(2). 
Rule 803(2) provides that a statement is not excluded by the hearsay rule if it
is A[a]
statement relating to a startling event or condition made while the declarant
was under the stress of excitement caused by the event or condition.@ 
Tex. R. Evid.
803(2).  To determine whether a statement
qualifies as an excited utterance, (1) the statement must be the product of a
startling occurrence, (2) the declarant must have been dominated by the
emotion, excitement, fear, or pain of the occurrence, and (3)
the statement must be related to the circumstances of the startling
occurrence.  Couchman v. State, 3 S.W.3d 155, 159 (Tex.
App.CFort
Worth 1999, pet. ref=d). 
Other factors to consider are whether the statements are spontaneous or
responses to questions and how much time has elapsed between the startling
event and the statement. See Wood v. State, 18 S.W.3d
642, 652 (Tex. Crim. App. 2000) (evaluating whether statement was excited
utterance after fourteen‑month delay); Bondurant
v. State, 956 S.W.2d 762, 766 (Tex. App.CFort
Worth 1997, pet. ref=d) (determining that
statement was excited utterance even though made in response to
questions).  It is not dispositive that the statement is an answer to a
question or that it was separated by a period of time from the startling event;
these are simply factors to consider in determining whether the statement is
admissible under the excited utterance hearsay exception.  Salazar v.
State, 38 S.W.3d 141, 154 (Tex. Crim. App.), cert.
denied, 534 U.S. 855 (2001).  AThe
critical determination is >whether the
declarant was still dominated by the emotions, excitement, fear, or pain of the
event=
or condition at the time of the statement.@  Id.
(quoting McFarland v. State, 845 S.W.2d 824,
846 (Tex. Crim. App. 1992), cert. denied, 508 U.S. 963 (1993)). 

Appellant
concedes  that the excited utterance exception
may  apply to the statements that Donna made upon first encountering
Officer Harmuth on the porch.  However, he
relies upon Moon v. State for the assertion that the statements that
Donna made to Officer Harmuth when he interviewed her
for a second time do not constitute excited utterances.  See 44 S.W.3d 589 (Tex. App.CFort Worth 2001,
pet. ref=d). 
These statements were made after Appellant had been interviewed by police,
Donna had put on more clothing, and a back-up officer had arrived.  In Moon,
the trial court did not abuse its discretion in admitting the statements that
the complainant made to police that her husband had Abeat
her@
approximately thirty minutes earlier under the excited utterance exception,
because the complainant=s statements were dominated
by her emotions, fear, and excitement.  Id. at
594.  However, the court determined that the trial court did abuse
its discretion in admitting the written statements that the complainant gave a
police officer within forty-five minutes of his arrival because she was not
excited or upset at the point when she gave the written statements.  Id.


Moon
is distinguishable from the case at bar because Donna=s
statements were made when she was still dominated by her emotions, fear, and
excitement.  According to Officer Harmuth=s
testimony, after Officer Harmuth separated Appellant
and Donna, he began to question Donna separately, and Ashe
was still visibly shaken, scared, soft/monotone when she answered my
questions.  You know, terrified.@ 
He later testified that she was Astill
very scared, trembling, afraid@ when she gave him those
statements.  The statements that Donna then gave Officer Harmuth were the product of a startling occurrence, the
alleged assaultCfamily
violence that occurred, and the statements she gave were related to the
circumstances of the startling occurrence.  Officer Harmuth
testified that he was in the house for approximately ten minutes when Donna
made these statements to him and it was the first opportunity that he had to
speak with her about what had happened.  He explained that he asked Donna
what happened, and she told him in narrative form.  Thus, the trial court=s
ruling falls within the zone of reasonable disagreement because the statements
that Donna gave to Officer Harmuth fall within the
excited utterance exception to the general prohibition against hearsay. 
Here, Donna was still dominated by the emotions, excitement, fear, or pain of
the event.  See Salazar, 38 S.W.3d at 154.

The
trial court did not abuse its discretion in determining that the statements
were excited utterances; thus, the State=s
purpose in calling Donna was not solely to introduce into evidence otherwise
inadmissible hearsay because the statements were not otherwise
inadmissible.  Furthermore, the statements had been previously admitted
through Officer Harmuth=s
testimony.  Additionally, one of the State=s
purposes in calling Donna was to corroborate portions of Officer Harmuth=s testimony and to confirm
that she had made the 911 call.  Therefore, we hold that the State did not
call Donna for the sole purpose of impeaching her with prior statements that
would otherwise be inadmissible.[1] 
Accordingly, we overrule Appellant=s
third point.

REQUESTED
JURY INSTRUCTIONS

In
his fourth point, Appellant contends that the trial court erred by failing to
include a charge to the jury regarding defense of third persons and regarding
the officer=s warrantless entry and ensuing
warrantless search of his home.

1.
Standard of Review

Appellate
review of error in a jury charge involves a two-step process.  Abdnor
v. State, 871 S.W.2d 726, 731 (Tex. Crim. App.
1994).  Initially, we must determine whether error occurred. 
If so, we must then evaluate whether sufficient harm resulted from the error to
require reversal.  Id. at 731-32. 
Error in the charge, if timely objected to in the trial court, requires
reversal if the error was Acalculated
to injure the rights of [the] defendant,@
which means no more than that there must be some harm to the accused
from the error.  Tex. Code Crim. Proc. Ann. art.
36.19 (Vernon 1981); see also Abdnor, 871 S.W.2d at 731-32; Almanza
v. State, 686 S.W.2d 157, 171 (Tex. Crim. App.
1985) (op. on reh=g). 
In other words, a properly preserved error will call for reversal as long as
the error is not harmless.  Almanza, 686 S.W.2d at 171.  In making
this determination, Athe
actual degree of harm must be assayed in light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@  Id.; see also Ovalle v. State, 13 S.W.3d
774, 786 (Tex. Crim. App. 2000).

2.
Requested Charge on Defense of a Third Person

Defense
of a third person is a justification for the use of force against another if
the circumstances are such that the person would be justified in using the
force to protect himself and Athe
actor reasonably believes that his intervention is immediately necessary to
protect the third person.@ 
Tex. Penal Code Ann. ' 9.33 (Vernon
2002) (emphasis added).  Appellant requested a jury
instruction on defense of a third person.  Appellant argues that the
instruction should have been given because, according to Donna=s
testimony, she became angry with Appellant and began to beat on his arm as
Appellant drove down the interstate highway.  She testified that, in order
to avoid having an accident, Appellant reacted by
striking her temple.  Appellant elicited testimony from Donna that he hit
her in order to prevent an accident from occurring to protect the vehicle,
Donna, and himself.  

The
application paragraph of Appellant=s
requested jury instruction stated the following:

Now, if you find
from the evidence beyond a reasonable doubt that on the occasion in question
[Appellant] did strike or grab or throw Donna White with his hand, but you
further find from the evidence, or you have a reasonable doubt thereof, that
viewed from the standpoint of [Appellant] at the time, it reasonably appeared
to [Appellant] that Donna White was in danger of bodily injury and there
was created in his mind a reasonable expectation or fear of bodily injury, and
that acting under such apprehension and reasonably believing that the use of
force on his part was immediately necessary to protect Donna White,
[Appellant] struck, grabbed, or threw Donna White with his hand, then you will
acquit [Appellant], or, if you have a reasonable doubt as to whether or not
[Appellant] was acting in defense of a third person on said occasion and under
said circumstances, then you should give [Appellant] the benefit of that doubt
and say by your verdict not guilty. [Emphasis added.] 

 

 In
essence, Appellant was requesting a jury charge on defense of a third person
for defending Donna from herself.   When interpreting a statute, we
look to the literal text for its meaning, and we ordinarily give effect to that
plain meaning.  Boykin v. State, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). The only
exceptions to this rule are where application of the statute=s
plain language would lead to absurd consequences that the Legislature could not
possibly have intended, or if the plain language is ambiguous.  Id. 
 The plain language of penal code section 9.33 provides a defense when
a person uses force against another in order to protect a third person. 
See Tex. Penal
Code Ann. ' 9.33.  Here, the evidence shows only that
Appellant used force against Donna to protect himself from Donna. 
Appellant=s requested charge reflects his
assertion that he was, in essence, acting to protect Donna from herself;
however, protecting Donna from herself is not protecting her from a third
person.  Accordingly, the trial court did not err in determining that
Appellant was not entitled to a jury instruction on defense of a third person.

3. 
Requested Charge Concerning the Warrantless Entry and Search

Article
38.23(a) provides that A[n]o evidence obtained by an
officer or other person in violation of any provisions of the Constitution or
laws of the State of Texas, or of the Constitution or laws of the United States
of America, shall be admitted in evidence against the accused on the trial of
any criminal case.@ Tex. Code Crim. Proc. Ann. art. 38.23(a) (Vernon Supp.
2005).  The court of criminal appeals has explained that the
admissibility of evidence is a matter for the court.  Pierce v. State,
32 S.W.3d 247, 251 (Tex. Crim. App. 2000).

The
second sentence of article 38.23(a) provides that, A[i]n any case where the legal evidence raises an issue
hereunder, the jury shall be instructed that if it believes, or has a
reasonable doubt, that the evidence was obtained in violation of the provisions
of this Article, then and in such event, the jury shall disregard any such
evidence so obtained.@ 
Tex. Code Crim. Proc.
Ann. art. 38.23(a).  This sentence can operate only if the trial
court has admitted evidence, and only if there is a contested issue of fact
about the obtaining of the evidence.  Pierce, 32 S.W.3d at 251.  Thus, there is no issue for the
jury when the question is one of law only.  Id.  
Accordingly, although a fact issue on a defensive theory may be raised Afrom
any source, and the evidence may be strong, weak, contradicted, unimpeached, or unbelieveable,@
an article 38.23 jury instruction must be included in the jury charge only if
there is a factual dispute about how the evidence was obtained.  Garza v. State, 126 S.W.3d 79, 85
(Tex. Crim. App. 2004).

In
the present case, Appellant requested a jury instruction under article 38.23,[2]
but the trial court denied his request.  Here, there was no dispute that
Donna called 911 and hung up, that injuries to Donna=s
face and neck were visible to Officer Harmuth when he
initially spoke with her, that torn up paper was scattered on the floor of her
house, or that she told Officer Harmuth that she was
scared.  Donna did refute Officer Harmuth=s
testimony that she came to the door dressed only in her underwear, explaining
that she also had on a sweatshirt.  She also testified that she told
Officer Harmuth that he could not come into the
house.  There was no dispute, however, as to the facts upon which the
exigent circumstances were determined.  Because a jury charge must be
submitted only if a factual dispute exists as to how the evidence was obtained,
we hold that the trial court did not err in refusing to include the requested
instruction.  See id.  Accordingly, we overrule Appellant=s
fourth point.

CONCLUSION

Having
overruled Appellant=s four points, we affirm
the judgment of the trial court.

 

DIXON W. HOLMAN

JUSTICE

 

PANEL
B: DAUPHINOT, HOLMAN, and GARDNER, JJ.

 

DAUPHINOT,
J. filed a dissenting opinion.  

 

PUBLISH

 

DELIVERED: 
August 10, 2006

 


 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

                                                
NO. 2-05-357-CR

 

 

JOHN ANSON
WHITE                                                                       
APPELLANT

 

                                                            
V.

 

THE STATE OF
TEXAS                                                                            
STATE

 

                                                      
------------

 

           
FROM COUNTY CRIMINAL COURT NO. 1 OF DENTON COUNTY

 

                                                      
------------

 

                                        
DISSENTING
OPINION

 

                                                      
------------

Because
I disagree with the majority=s conclusions that the
warrantless entry into the house was lawful, that the prosecutor did not
comment on Appellant=s failure to testify, and
that the complainant=s response to the
investigating police officer=s directive to explain
what had happened was a series of excited utterances, I respectfully dissent.

The
majority holds that Officer Harmuth and the back-up
officer were justified in entering the house without a warrant Aunder
the emergency doctrine@ in that, at the time
Officer Harmuth entered the house, Ahe
had an objectively reasonable cause to believe that, absent an immediate
search, serious bodily harm or death [could] result.@[1] 
Serious bodily harm or death to whom?  The complainant was at the front
door within the protection of the police, freely able to leave at any
time.  Appellant was in another room and not visible.  Neither the State, the majority, the police officers, nor the
complainant has suggested at any time that any other person was present
inside the house.  Who was in danger? 

Indeed,
the record does not support the majority=s
conclusions.  Officer Harmuth testified that he
never attempted to learn why the complainant told him that she was
scared.  He testified only that his purpose in entering the house was Ato
investigate what was going on.@  He also testified, AThere
was obviously a situation which needed to be investigated, and I went inside.@

As
the majority correctly states, A[a] search conducted
without a warrant is per se unreasonable unless it falls within one of the >specifically
defined and well-established= exceptions to the warrant
requirement.@[2] 
Additionally, the majority correctly states that A[t]he
motivation for entry pursuant to the emergency doctrine must be >totally
divorced from the detection, investigation, or acquisition of evidence relating
to the violation of a criminal statute.=@[3] 


Yet
Officer Harmuth testified that his only purpose in
entering the house was to conduct an investigation.  The majority=s
conclusion that Officer Harmuth Ahad
an objectively reasonable cause to believe that, absent an immediate search,
serious bodily harm or death [could] result@
can in no way be derived from the officer=s
testimony.[4]

Similarly,
although the majority concludes that Officer Harmuth=s
entry into the house was justified by and Alimited
to the determination of whether [the complainant] was in danger of serious
bodily harm or death,@[5]
the complainant was in none of the rooms that the police searched.  She
was at the front door and merely followed the officer back to the
bedroom.  If there was a threat to the complainant=s
safety, it lay in the room she followed the officer to.  Officer Harmuth had only to ask the complainant, while they were at
the front door, to step outside and tell him what was going on.  There was
no emergency.

Hammon v. Indiana, a
recent United States Supreme Court case addressing the issue of whether a
complainant=s statement made to law enforcement
personnel at a crime scene was testimonial and thus subject to the requirements
of the Sixth Amendment=s confrontation clause,[6]
concerned similar facts.  As in the case now before this court, the
complainant, Amy Hammon, was on the front porch and
her husband, Hershel, was inside the house.  When the police arrived in
response to a domestic disturbance call, Amy Hammon
told the police that nothing was the matter, but she appeared frightened. 
Hershel Hammon was in the kitchen.  Officers saw
broken glass on the floor.  The officers separated Amy and Hershel and
asked each of them to explain what had happened.

In
distinguishing between testimonial and nontestimonial
statements to reach its ultimate holding that Amy=s
statements were testimonial, the United States Supreme Court also distinguished
between emergency situations and non-emergency investigations:

Statements are nontestimonial
when made in the course of police interrogation under circumstances objectively
indicating that the primary purpose of the interrogation is to enable police
assistance to meet an ongoing emergency.   They are testimonial when
the circumstances objectively indicate that there is no such ongoing emergency,
and that the primary purpose of the interrogation is to establish or prove past
events potentially relevant to later criminal prosecution.[7]

 

In
Hammon, the court explained why there was no
emergency and why the response to the police interrogation was therefore testimonial:

It is entirely
clear from the circumstances that the interrogation was part of an
investigation into possibly criminal past conductCas,
indeed, the testifying officer expressly acknowledged.  There was no
emergency in progress;  the interrogating officer
testified that he had heard no arguments or crashing and saw no one throw or
break anything.   When the officers first arrived, Amy told them that
things were fine, and there was no immediate threat to her person.  When
the officer questioned Amy for the second time, and elicited the challenged
statements, he was not seeking to determine Awhat is happening,@ but rather Awhat happened.@  
Objectively viewed, the primary, if not indeed the sole, purpose of the
interrogation was to investigate a possible crimeCwhich is, of course,
precisely what the officer should have done.[8]

 

In
Davis v. Washington, Hammon=s
companion case, the court determined when statements made to law enforcement
during a 911 call are testimonial and thus subject to the strictures of the
Sixth Amendment=s Confrontation Clause.[9] 
The complainant in that case, Michelle McCottry,
spoke with a 911 operator during an ongoing domestic violence assault. 
After the 911 operator learned the identity of the assailant, Adrian Davis, and
that he had run off during the 911 conversation, she interrogated McCottry, discovering Davis=s
personal information and why he had been at McCottry=s
house and getting McCottry=s
description of the Acontext
of the assault.@[10]  As the United States Supreme Court points out,
the 911 call was initially Aplainly a
call for help against [a] bona fide physical threat,@
and the statement providing the assailant=s
identity was not testimonial.[1][1] 
But, even in that case, the United States Supreme Court emphasized that

after the operator
gained the information needed to address the exigency of the moment, the
emergency appears to have ended (when Davis drove away from the
premises).  The operator then told McCottry to
be quiet, and proceeded to pose a battery of questions.  It could readily
be maintained that, from that point on, McCottry=s statements were
testimonial 

 

because
they provided an account of past events after the emergency had passed.[1][2]

It
is clear from a thorough review of the record in the case now before this court
that Officer Harmuth=s
only purpose in entering the house, according to his own testimony, was to
investigate a possible completed criminal offense.  Relying on the test
established by Davis and Hammon, there
was no ongoing emergency when Officer Harmuth arrived
on the scene.  Just as Amy Hammon was under the
protection of the police when she gave her statements, so was the complainant
in the case now before this court when she told her story.  Officer Harmuth responded to a 911 call, but from the time that he
met the complainant at the front door, he sought to investigate what had
happened, not what was happening.  This investigatory purpose does not
transform the illegal, warrantless entry into a legal one.  Because the
majority opinion is in direct conflict with the clear test established by the
Supreme Court of the United States, I dissent from the majority=s
upholding the search as an emergency when no emergency existed.

         
The majority also holds that the State=s
closing argument, AHis
defense isCselfBdefense . . .
.  [T]hey have to admit . . . .  He=s
got to say he hit her,@  Awas
not of such a character that the jury would have naturally and necessarily . . .
considered it to be a comment on the defendant=s
failure to testify.@[13]  

The
majority relies on the trial judge=s
comment regarding the complained-of argument to hold the prosecutor=s
statement ambiguous.  The trial judge responded to Appellant=s
objection to the prosecutor=s argument that Appellant
would have to admit that he had hit the complainant, saying, @I
believe what he said was, she=s got to say he hit him
[sic].  That=s what the record states
in front of me that I=ve
got,@
and AThat=s
what the court reporter has written right here, she=s
got to.@

It
has long been established that a trial judge shall not Aat
any stage of the proceeding previous to the return of the verdict, make any
remark calculated to convey to the jury his opinion of the case.@[14] 
In the case now before this court, the record clearly reflects that the
prosecutor said, AHe=s
got to say he hit her.@  Only the trial
court=s
statement to the contrary suggests that the prosecutor said anything else.

         
AThe
court, instead of merely ruling upon the objection as he should have done, made
a comment upon the complained of argument. . . . @[15] 
Because the prosecutor=s argument in the case now
before this court was clearly a comment on Appellant=s
failure to testify, the trial judge could not create any ambiguity by
expressing a personal opinion.  I therefore respectfully dissent from the
majority=s
holding otherwise.

Finally,
the majority mischaracterizes the complainant=s
narrative statement to Officer Harmuth in response to
his directive that she explain what had happened as a series of excited
utterances because Athe
complainant=s statements were dominated by her emotions,
fear and excitement.@[16] 

It
is well established that 

An excited
utterance is Aa statement relating to a startling event or
condition made while the declarant was under the stress of excitement caused by
the event or condition.@  The basis
for the excited utterance exception is Aa psychological one,
namely, the fact that when a man is in the instant grip of violent emotion,
excitement or pain, he ordinarily loses the capacity for reflection necessary
to the fabrication of a falsehood and the >truth will come
out.=@  In other
words, the statement is trustworthy because it represents an event speaking
through the person rather than the person speaking about the event.

 

In determining
whether a hearsay statement is admissible as an excited utterance, the court
may consider the time elapsed and whether the statement was in response to a question.[1][7]

 

In
Hughes v. State,[1][8] our
sister court in Tyler rejected the State=s
contentions that a complainant=s statements produced as a
result of an interview were excited utterances:

 

. . . .  That
some of a declarant=s statements were in
response to questions does not necessarily make them inadmissible under this
exception to the hearsay rule.  But it is an important factor in
determining the spontaneity of the statement.  Both Deputy Wellborn and
Ms. Baggerly asked C.D.H.
questions calculated to elicit information about past events and
activities.  AResponses to this type of
questioning are normally considered reflective narratives of past events@ and hence lacking
the spontaneity required to be admissible under this exception. . . . [T]he
rule requires a determination (1) whether C.D.H.=s presence with
Opal and Deputy Wellborn at Opal=s interview was an occurrence startling
enough to produce a state of nervous excitement which would render her
statements made during two lengthy interrogations Aspontaneous and unreflecting@ and, if so, (2)
whether the startling event continued to dominate the reflective powers of her
mind during that period.  Several circumstances argue against it here.

 

C.D.H. was brought to the
Grapeland Police Department to lend moral support for her younger cousin Opal
while she talked to the investigators.  Opal and C.D.H.
had recently discussed their shared history as victims of sexual abuse.  C.D.H. had assured Opal that if she had to turn her father
in, she would not be left to suffer alone.  She knew why she was going to
be with Opal, and she knew what she was going to hear.  It was undoubtedly
stressful but should not have been startling or surprising.  The two
interviews were conducted in tandem.  The length of the interviews is
itself a circumstance arguing against unreflecting spontaneity.  The
record indicates that both girls remained in the room throughout the interviews
by both Deputy Wellborn and Ms. Baggerly.  The
investigators, in their testimony, did not recount unreflecting statements made
by the complainant.  Instead, they summarized what they described as a
very detailed narrative that emerged over a protracted interrogation.

 

. . . . 

 

Responding to the
investigator=s questions, C.D.H. narrated a painful personal history.  But
narrations, especially of this length, are inherently reflective, not
spontaneous.  As its name strongly suggests, the exception for excited
utterances or spontaneous declarations was not developed to allow the introduction
into evidence of extended narratives by crime victims,
and certainly not summaries of those narratives as in the instant case. 

. . . . 

 

In this case, it is
impossible to conclude that C.D.H.=s statements were
made without opportunity for reflection or deliberation.  We decline to
further expand the excited utterance exception to include a summary distilled
from a protracted interrogation.[1][9] 

 

In
the case before us, the majority=s
conclusion that Athe
statements that [the complainant] gave to Officer Harmuth
fall within the excited utterance exception to the general prohibition against
hearsay because [the complainant] was still dominated by the emotions,
excitement, fear, or pain of the event@[2][0]
is not supported by the record.  After Officer Harmuth
entered the house, and after he spoke with Appellant, the complainant told her
story to Officer Harmuth in response to his directive
that she explain what had happened.  The
circumstances in which she told her story, as provided in the record, in no way
indicate that she had lost the capacity for reflection necessary to the
fabrication of a falsehood.  Indeed, the officer=s
asking her to explain what had occurred that evening presupposes that she would
reflect on her answer before speaking.

Additionally,
the record shows that Officer Harmuth arrived at the
house about fifteen minutes after the 911 hang-up call and that he did not
begin his separate interview with the complainant until about ten minutes after
he arrived.  Before Officer Harmuth began his
interview with the complainant,  she apparently
heard her husband give his version of the events that had taken place to the
officer, and she angrily interrupted the interview to correct her husband. 
Even though the complainant stated that she was afraid when she spoke to the
officer at the front door, about ten minutes later, she was not too afraid to
return to the bedroom and argue with her husband about his version of the
events that had transpired before giving the officer her own story. 
Because the majority incorrectly characterizes the complainant=s
story as a series of excited utterances, I must respectfully dissent from this
portion of the majority opinion.

For
all the reasons stated above, I respectfully dissent from the majority opinion.

 

LEE ANN DAUPHINOT

JUSTICE

 

PUBLISH

DELIVERED:
August 10, 2006

 



 









[1]Appellant does not contend
that the use of Donna=s prior statements
at trial was a violation of Crawford v. Washington, 541 U.S. 36, 124 S.
Ct. 1354 (2004).  Accordingly, that issue is not before us.





[2]We note that the
application paragraph of Appellant=s requested instruction is incorrect in
that it fails to instruct the jury that a warrantless search could be justified
under either the emergency doctrine or under exigent circumstances.  





[1]Majority
op. at 14.





[2]Id. at 7 (citations
omitted).





[3]Id. at 8-9 (citations
omitted).





[4]Id. at 9.





[5]Id. at 15.





[6]Hammon v. Indiana,126 S. Ct. 2266, 2270
(2006).





[7]Id. at 2273-74
(footnote omitted).





[8]Id.
at
2278.





[9]126
S. Ct. 2266, 2270 (2006).





[10]Id. at 2271.





[11]Id. at 2276-77.





[12]Id. at 2277.





[13]Id. at 16, 18 (emphasis
added).





[14]Tex.
Code Crim. Proc. Ann. art. 38.05
(Vernon 1979).





[15]McClory v. State, 510 S.W.2d 932, 934 (Tex. Crim. App. 1974).





[16]Majority
op. at 22.





[17]Zuliani v. State, 97 S.W.3d 589, 595-96 (Tex. Crim. App. 2003) (emphasis added)
(citations omitted). 





[18]128 S.W.3d 247 (Tex. App.CTyler 2003, pet. ref=d).





[19]Id. at 253-54.





[20]Majority
op. at 23.